The final case of the morning is number 24-202-07, oh sorry that's the wrong case number, pardon me, final case is 24-603-81, Edwards v. Guardian Life Insurance, and we'll hear from Mr. Wade. Good morning Your Honor, may it please the Court. Yes sir. Your Honor, the purposes of the Employee Retirement Security Act of 1974, or RESSA, has nothing to do with protecting independent businesses, it is to protect employees. The threshold question in this case is whether the technicians, the ladies that did hair and nails at this very small business in Starkville, were independent contractors or were they employees. As far as I know, there could not be any more fundamental rule of civil procedure that ordinarily, except for certain exceptions such as 1983 cases for example, that the parties are entitled to discovery before a summary judgment is issued. When the United States Supreme Court decided those three cases in 1956, which effectively made summary judgment the center of trials instead of trials themselves, when they decided those three cases, they all acknowledged that summary judgment is permissible after discovery. Let me ask you a question, Mr. Wade. Judge Johnson's opinion says, here's the five-factor test for employee versus independent contractor, and that the Fifth Circuit and other courts have relied on, and she said neither side really briefed this, but I'm going to tell you the answer anyway. I don't know whether you all briefed it or not at the district court level. I hadn't looked into that, but if that's a decisive test, it seems to me she'd want to have some evidence on that. That's what I think, Your Honor, and I don't think she said we didn't brief it. She said the parties didn't produce any evidence, but we couldn't produce any evidence because she wouldn't allow discovery. She said, I find that they're employees, but no discovery is allowed. When they filed their summary judgment motion, we tried to respond by putting Jimmy Edwards, which I thought was a competent affidavit, she apparently didn't, the husband, Jimmy, to put in his affidavit that they were, in fact, independent contractors. I know he's not a lawyer. He was a court security officer, but he wasn't a lawyer, but he said they were independent contractors, that they just gave them 65% of what they took in. There's no evidence in the record about, for example, do they get their own customers. I come to my wife to get her hair done a lot, and I know they've always done it with the ones she's dealt with. It's their own business. The owner owns it, and they get a percentage of it, but we haven't ever questioned them, so we don't know whether they're independent contractors or employees without discovery. So, the first point I want to make, Your Honor, the threshold question, and the court need not really reach any of these other highly technical questions involved in this case is can we not have discovery and find out whether they're independent contractors or whether they're employees, and if they're independent contractors, of course, we just have the common law of Mississippi insurance, which we think we'd clearly be entitled to prevail under. Second, Your Honor, in order to dismiss this case, she had to find also that the insurance policy had been validly canceled, and I'd like to comment on what the law is on cancellation. First, the policy does provide a right to cancellation when there's only one life insured, but it does not say, there's not a word in it about how is cancellation to be done. The policy doesn't say anything about that. Could you cancel by sending them a registered letter? Well, it doesn't say that. Could you cancel it by ordinary mail? It doesn't say that. It just doesn't say anything, and both sides, one of the few things both sides agree on, on page 51 of their brief, they say this, and it's what I say also, whether a cancellation notice is valid depends on state law. They haven't. Everything else, according to them, is governed by federal law, but they agree that that question, or they cite cases on state law, and so, and I cite cases to the contrary. I don't want to get up here and argue the technicalities between their cases and our cases, but I've had one of those cases myself, and I do not believe that an ordinary mail notice of cancellation would affect cancellation. There's no way to, at least there's an issue of material fact as to whether she ever received that notice, and the reason I say there's an issue of material fact is the agent, and in fact, on the notices themselves, they claim that they sent a copy of the notice of cancellation to the agent, Ms. Jolliff, and she says, I never got the notice. In fact, looking at the notice, in your honor, it's on page, it's attached to the complaint, it's on pages 13 and 14. That would be suspicious to me to look at for several reasons. For one thing, there's nobody's name, nobody signs this notice of cancellation, and it's signed, it has the top Guardian, just Guardian, nothing else, and at the bottom, it's signed Enterprise Operations and Service. I don't know whether that's an arm of Guardian, or whether that's, they said a third party mailed it, there's no way to know, I don't even know whether that's a third party mailer, or whether that's Guardian. It would be reasonable for a jury to infer that they did not intend for her to get this, or to ask questions about it, because they do have an 800 number, but there's no name or anything. So, you know, she's deceased, I don't know whether she ever tried to get anybody or not, there's no way to know. But I do know that this, it seems like our jury could infer that they really weren't trying to give it to her. And when Ms. Jordan, we know it's true that Ms. Jordan didn't get it, because she told Jimmy Edwards he didn't know there was insurance, and she told him that the policy was in effect, and he was entitled to the policy after Pam Edwards died. So, there's at least an issue of material fact as to whether this notice of cancellation was ever received. The district judge did not seem to dispute that receipt was necessary. I'm sorry, I'm sorry. No, that's okay. She didn't seem to dispute that receipt was necessary, because she just said, well, there's a presumption if it was mailed, it was received. And they do have records showing that they mailed it, so I'll give you that. But this policy was sold like 17 years ago, and Ms. Jordan said, I never gave her a copy of the policy. They say they have mailing records indicating that they mailed the policy in 2017, but I still think that's open to dispute as to whether they did or did not. But in any event, there was an issue of material fact as to whether the policy was canceled, so summary judgment should not have been granted for that reason. Mr. Wade, can you explain to me the mechanics of how the premiums were paid? All I know is a bank withdrawal, Your Honor. They signed an authorization for them to withdraw, regarding to withdraw the premiums. I can't explain it beyond that. So, it auto-drafted? Yes, it automatically drafted. How were the changes made over time in the amount of the premium payment? Because I understand that sometime prior to November of 2019, premium payments were being made for more than one person, and then in November of 2019, that changed. The way I understand it, that's true, Your Honor, but if there are any documents in the record, I'm not aware of them about exactly how that was done, but I understand there were various numbers. The number of people insured were changed over the years, I think. That's about all I can say about that. So, if I'm understanding the answers to those two questions, some of this is being done automatically, the drafting, but some of it is involving Ms. Edwards' election or ticking of a box, or somehow there's some human agency involved in the decision. I think that's fair, Your Honor. Your Honor, the next thing I want to do is talk about preemption a little bit. She said that this Mississippi law, the best case on this is not really the Kelly case. We emphasize the Kelly case, but it's more the Brown case, Brown v. Blue Cross, which is almost directly on point if this case had been in a Mississippi court. It was a group insurance policy, and the medical expenses, the employer canceled the policy, but the insured was pregnant at the time, a beneficiary of the policy, and the insurance company wouldn't pay, and the Supreme Court said it was covered because she was already pregnant when the policy was canceled, so it's very close on the facts. I want to bring Your Honor's attention. This is a case that cited my brief, but not for the right point. The correct site where this issue is discussed is 926 F. Second at 1454, and this court in that case held that a person that had liver cancer was covered despite the policy having been canceled because it followed a Louisiana statute to that effect. The Louisiana statute said you couldn't cancel the policy after a person has the onset of the fatal illness. So this court ruled that that was not preempted, that that was subject to the savings clause, and that holding was in the Gone case, so we believe that's the best case. Your Honor, the next issue is the right to conversion. Nobody disputes, everybody says, and it's quoted, I think it's on page 71 of the record if I'm not mistaken, but nobody disputes that there's a right to convert this policy. It is on page 71. That's where it says in the record that you have a right to convert this policy. What do you mean, from a company policy to an individual? Yes, ma'am, from a group policy to an individual policy. And the issue then is when they said, and Ms. Jodd had also testified that that standard in the industry, that if your policy is canceled, the company wants to keep it in effect, so they give a notice of conversion, of a right to conversion. That is not shown on this cancellation notice. And the fiduciary duties of a risk, Your Honor, as I understand it, require the insurance company to act in the best interest of the beneficiaries or the sole interest, I think the language is. But that would have carried or should have carried the right to conversion, and the right to conversion should have been given in order to, assuming it's an ERISA policy, to carry out their fiduciary duties. There should have been a right to conversion, and she should have been notified of it. Ms. Jodd said I didn't give her a copy of this policy, but as Your Honor knows, these policies are lengthy and detailed, and to say that she should have looked in there and known she had a right to conversion when she was just about to die of cancer is a little unbelievable. But to carry out their fiduciary duties, I should have notified her of the right to cancel. It said she only had 31 days to convert, and she has to apply in writing. I don't know apply in writing to whom. I don't know. It doesn't say on this cancellation notice. The last thing, Your Honors, I want to talk about just the Taggart case and then the cases from this court. I'm not going into the details of any of them, but the cases from this court and the Taggart case. There was a statement made in the Taggart case, 617 F. Second 1208, that a simple employer, a small employer buying a life insurance policy is not in itself enough to create an ERISA plan. Now, Judge King, I'm embarrassed to say that you wrote a decision, the Memorial Hospital decision, casting some doubt on that and relying on a case, the Donovan case, where the Eleventh Circuit had expressed and said they weren't going to follow it. But then after that, there's been another case from this circuit, the Kidder case. These are all cited in the brief, just questioning, you know, what's the law in the Fifth Circuit on this issue? And that's the subject of this law review article that I just sent to the court. And here's just the basic, simple thing. I want to make this point about it. One of the most fundamental rules of this court is that we follow the first case decided if there's any conflict between the cases. This court applies the first case decided. That's the Taggart case. It was decided in 1980. And not only does the Eleventh Circuit case, you know, we ordered to follow the Eleventh Circuit case because it disagreed with Taggart, essentially. But what I'm suggesting is that I'm asking your honors to follow the Taggart case and not the subsequent case, although one of them, Judge King, I understand is your case, the Baptist Memorial Hospital case. And here's the reason I feel like the court should do that. If anything is clear about arrest, it is that it was to protect employees. The heart of the problem was that employers were letting the funds, like pension plans, get away from them. So the employees were not being protected, and that's what the whole purpose of it was. Just an employer buying an insurance policy doesn't do anything. That purpose never comes about. The employer pays for the insurance, and that never comes about. But what it does do, and your honor, I know the dire case that your honor Judge Oldham wrote is not directly on point, except that it points out the problem, which is that the insurance companies really don't have any incentive under arrest to pay these claims because all they get, they get the benefits, and I'm not even sure they get interest. It's not in the statute that they get interest. So they have a disincentive to pay these claims, a strong disincentive, because they got the use of the money. And if the insured wins, if he gets through all the hurdles of arrest and he manages to win, that's all he gets is the benefits. Even the insurance attorney fees are not allowable. And to me, this court should not adopt an interpretation that just flies in the face of what Congress intended. It just cannot be. Congress had no intention. They never said a word about we want to keep insurance companies to make it as difficult as possible to get claims paid. That was not what their purpose was, or to aid insurance companies. Your red light's on. Sorry, Your Honor. All right, that's fine. Thank you. Yes, ma'am. Mr. Simpkins. May it please the Court. The very first thing I'd like to do is address your question, Judge Jones, about the discovery. Now, what Judge Johnson ruled was that the appellate had not addressed the Darden factors, the nine or ten factors that are in Darden in its responsive brief, and then says that Guardian barely addressed those in its reply. So let me address the question this way first. The reason we did not address it until our reply in support of motion for summary judgment is because the independent contractor status argument had never been raised before. So if you think about the chronology of this, coverage was terminated in January of 2022, and then she passed away in May of 2022. And then Mr. Wade sends two letters claiming, I don't see how you have a right to cancel the coverage unless it's in the policy. And in the record, the administrative record, we respond and we quote the section on the policy that gives us the right to cancel it when it's down to one life. And then the next thing that happens is the complaint is filed. Well, the complaint says I'm asserting a common law claim for breach of contract, but in the alternative, if it's ERISA, I'm asserting an 1132A1 claim for benefits under ERISA. No mention of independent contractor status. We file our motion for partial summary judgment, and the very first occasion that we hear about, whoa, after 18 years, we're going to claim that these are independent contractors, not employees. Well, you know, a lot of us have been to the hairdressers, and there's some common sense involved in this, common knowledge. And there's also some uncommon ignorance. I mean, there's common knowledge about what's going on in the hairdresser, but also the one person who knew about this policy tragically is no longer with us. So who was supposed to be identifying that? As Judge Jones points out, anyone who knows anything about hair salons knows that these are independent contractors. But how in the world was the husband here supposed to know about the whole nature of this policy and all of the, you see, 18 years as if he was, like, sleeping on his rights? He didn't even know the policy existed. Well, he didn't, and that's why I think the court's decision in ANOVA where it says you can't come open the gate to discovery armed with only conclusory allegations. Let me go back in time. I want to make sure. You start the story in January of 22. I want to start the story in November of 2019. What did your client need in January of 2019 to cancel this policy? What was the unknown fact that you needed to discover? That it was down to one life. And you didn't know that in November of 2019? We did know that in November of 2019. And as our brief sets out, the process by which we would cancel one-life policies is we would wait until the renewal period, three months before the renewal period. Well, that puts you into 2020 on this policy. Well, by then, we were in the middle of a worldwide pandemic. And Guardian had suspended its business-as-usual practice of canceling one-life policies. It resumed that practice in 2021. And Mrs. and the Allure salon, along with 57 other policies, were terminated at that time. So there was no additional fact that you needed to know in 2019? Correct. Because it's not like you were doing due diligence. It's not like there was underwriting or actuarial thing. This was just straight up you knew. How did you know? How did the insurance company know? That there's one life? Yeah. Because Judge Oldham was mentioning the human factor. So throughout the course of the 18 years that this plan was in place, there were new employees added, other employees dropped. And so she submits information that she's dropping someone from the coverage. And now we know it's one life. We are sending notices of premium monthly. Yeah, but you could. So if she had died in April of 20, the policy would have paid? Yes. So the whole problem is she waited too long to die. Well, I wouldn't say she waited too long to die, because she didn't choose to die. What I would say is it's an unfortunate set of circumstances that she passed away five months after the coverage was terminated. When was the COVID stay imposed? You know, the sort of the forbearance? It's in the record, but it was suspended. The business as usual was suspended sometime in early September. Sorry? September of 2020. I think it was earlier than September of 2020. You have a record set? I thought it was September of 2020. It may be, Your Honor, but it was suspended. Well, it really matters, doesn't it? Pandemic. Yeah, it really matters, doesn't it? I'm sorry, I can't hear you. I'm sorry. The acoustics in here are terrible, as our last argument illustrated. It really matters when you impose the forbearance. I'm calling it forbearance, but you call it the business as usual decision. But you don't know. You think it might have been January of 2020, but you think it might have also been September of 2020? It's in the record, and I can pull it up. It's in the administrative record that's in the court file, the exact date that it was done. So I think it was September of 2020. Can we go with that? Maybe it's a hypothetical and I'm wrong, and you can explain to me why I'm wrong. But if it was September of 2020, that means that you waited nine months, ten months, actually, after you had all of the complete information that you needed. There was ten months of lag, where Guardian was accepting premium payments from Allure, knowing that the policy was subject to cancellation, not canceling the policy, not providing a notice of conversion for ten months. Yes? Well, yes, except you have to remember, you back up three months before the anniversary date. So September, that was the time that they would otherwise have examined, are we canceling these individual, these single-life group policies? That would have been the time they would have looked at it, but they suspended that practice. So you're right at the same time. Are you familiar with our PITS decision? Which decision? PITS, P-I-T-T-S? I am familiar with that decision. And in PITS, though, the difference was this was not the differences. We didn't accept premiums and pay benefits knowing that there was an illness or that we might have a voidable policy. I'm sorry. We started this entire line of inquiry with you telling me that this policy was voidable in November of 2019. I asked you three times. What else did you need to know that you could cancel this policy in November of 2019? And you told me over and over nothing. We were ready to cancel it. We were just waiting until January, which would have been of 2020, which would have been the renewal period. January of 2020 came. You didn't do it. February, March, April, May, June, July, August, September, you still haven't canceled it. The whole time you're taking premiums from this poor lady, not canceling her policy, all before we get into the suspension of the business-as-usual thing. Yes? PITS says five months. You took ten. Why is that not the end? The difference is in PITS, in the Fifth Circuit's opinion in PITS, it said it could have continued to pay benefits if it had issued a reservation of rights letter. We're not paying benefits. I know. That seems to be the problem. I mean, that makes a difference if it's void versus voidable, void ab initio versus voidable. We have the right to cancel it under the terms with a lure salon at any time it drops to one life. And so I think PITS, in our opinion, PITS doesn't apply because it's a different facts scenario. Judge Johnson found that. She said this was not applicable because of the very reasons. How many months of premium payments could you have taken from this woman with cancer and not canceled her policy before you would be stopped from doing it? What's your number? It's not five, it's not ten. What's the number? According to the policy, it says we may cancel it when it's one life. But you don't have any obligation to. So could you have continued taking her premium payments up until the day she died? I could have, according to the policy language. Could she have converted it to an individual policy? Yes, she could have. And where's the notice of her right of conversion? Well, the problem is that's conflating a claim fiduciary duty with a planned administrator duty. And I recognize with a small employer, sometimes you've got a small employer, but actually the person who had to provide that notice is a lure salon. We were a claim fiduciary. And under the law, we are not the planned fiduciary or the sponsor of the plan. So once the policy is delivered to a lure salon and the contract itself says a lure will distribute all notices, we've cited some cases that say that we don't have an obligation to do that. But if it's not an ERISA policy, then what? The conversion right. Who has the obligation to notify about the conversion right? Then you're looking at a contract issue, and there still is nothing in the contract that requires, even if it's not an ERISA plan, it still imposes upon the plan. So the insurance policy has the provision about conversion. Yes, it does. So that means your lawyer, Ms. Jovan, should have told her. You mean the agent, Debbie Judon, should have told her? Yes. Well, I don't know that the law imposes that burden on Debbie Judon either. I mean, the cases cited even by the appellant in this case say that there's an obligation to read and understand the policy that's in force and effect. But I want to address one other thing about the discovery, if there are no further questions on this issue, because one of the things that Judge Johnson . . . The first thing you can look at to say whether or not she abused her discretion in denying a discovery in this matter is the affidavit of Mr. Wade. And Mr. Wade's Rule 56 affidavit in the record at 128 says that we need to take the discovery only if the court finds . . . take these depositions, quote, only if the court finds that Mr. Edwards is not competent to testify as to whether they're independent contractors versus employees. Well, she didn't find that he was incompetent. In fact, if you look at her opinion in the footnote, what she says is, I'm relying upon Mr. Edwards' own affidavit and publicly available information to analyze these dark factors. And so she appropriately analyzed them based on the information that was in front of her. The Supreme Court has said . . . And we cite Thomas V. Miller that relies upon Arbol v. YNH Court, which is a Supreme Court case. And that Supreme Court says when there are questions of fact regarding jurisdiction, the court is authorized to review the evidence and make the decision. Now the cases that you heard Mr. Wade cite when he got up here, those are not ERISA cases. They're not even jurisdictional questions. So Arbol says if subject matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on the run. Are you saying that ERISA governs whether more evidence can be provided? No, Your Honor. What I'm doing is I'm citing cases that relate to determination of subject matter jurisdiction. And that's Arbol v. YNH Court, which is a U.S. Supreme Court case. I mean, I assume there would be diversity jurisdiction here if there's not ERISA. That is true, but she's making a determination as to whether or not there's subject matter jurisdiction under ERISA as well. I don't care. I mean, yeah, but the facts can, if you don't have adequate facts, I mean it's, Mr. Edwards clearly said he had nothing to do with the day-to-day operation of the business right. No knowledge whatsoever. Yes, but I think, you know, just to briefly hit some facts that I think are important, when Mrs. Edwards applied for this group coverage on behalf of Allure Salon, in her five-page application, ten times she represents that there . . . I'm not saying how this would come out, but I am suggesting that even if the employees are independent contractors, she could have purchased the policy to cover them, right? Well, certainly she could purchase coverage for them if they were independent contractors, but I don't think it's irrelevant that ten times in a five-page application she represents their employees, that in the course of the 18 years she also submits new applications, new enrollments, and drops others off. They're referred to as employees over 225 times in the course of the . . . Let me ask you a question. If she had, number one, independent contractor was not an option on the application, right? No, it wasn't, because it wasn't offered. It wasn't coverage offered for anything but full-time employees. Of course it wasn't on there, because they don't offer that kind of group coverage for someone providing benefits for an independent contractor. But the thing with the Darden factors that . . . I guess I disagree that Judge Johnson said that these were not addressed. What she said was not all of them were addressed. And I went through . . . There's 11 different Darden factors that are met in this case, if you look at the record. Well, there's not much in the record, that's all I'm saying. But there's enough. Two affidavits, right? Well, no, there's Mr. Edwards' own affidavit that she relied upon. There's publicly available information from the website. There's also non-disputed information regarding how she paid for it. That's not in the website itself, but that's . . . Well, I mean, again, to the extent it's relevant, the fact that they're independent . . . The question of independent contractors turns on who used the tools, who determined what they were going to do, how did the . . . in the revenue-sharing arrangement that they had, did they get 1099s or W-2s? Did her share of the revenue cover a proportional share of the rent or more of the rent? You know, that kind of thing. Well, yes, except there was enough there that the court could make a decision and exercise her discretion on whether or not there should be additional discovery, because you had information that indicated where they worked. You had information that she owned the building, so she provided the place. You had information that she collected all of the gross receipts, deposited them in Allure Salon's account, and then paid them. Again, you're talking to at least two members of this panel who are very familiar with these kinds of operations for many years. Well, I wouldn't assume there's not a third, Your Honor. Oh, you could safely assume. It's safe to assume. I hear what you're saying, but we did cite a link, Your Honor, because we cited a link to a trade organization that says it can depend on the situation, whether they're independent contractors versus employees. And the other thing, that's what the Darden factors provide us. They tell us, here's how we're going to determine if they're independent contractors versus employees. We don't need the depositions of the workers. They won't know whether they're independent contractors and employees. They may. They may not. Mr. Simpkins, before your time expires, I want to make sure I understand. The value of this policy is $85,000? Yes, it is. Do you have an estimate of the amount of attorney's fees spent on both sides in this case? Well, I have no idea what Mr. Wade has spent on this case, but I can tell you that our fees are much less than the benefits. Much less than $85,000? Yes, sir. And is there fee shifting? I know ERISA has a fee shifting provision. Is there fee shifting under Mississippi law for the amount of the fees incurred? No, not unless it's in a contract or unless it's under common law. For example, you can recover attorney's fees if this were a common law bad faith case. You could recover attorney's fees in that circumstance. But you could get them under ERISA? You can get them under ERISA. So if we were to hold that ERISA applies and that Guardian loses, then the value of this claim would go up significantly? Well, it could if the district court was to award attorney fees to Mr. Wade. Very good. Thank you. All right. If there are no further questions, I see my time is about up. Thank you.  Okay, Mr. Wade. Your Honor, Judge Alderman, to the extent this is appropriate to tell the court, since you asked about attorney's fees, Jimmy Edwards is a friend of mine. I would not have done this case. I do it on a contingent fee basis of a third, and I wouldn't have done it otherwise because there's no way to come out on it under an ERISA claim because the resistance is going to be very skilled and hard and plenty of technical things to deal with, and an $85,000 policy just wouldn't make it worth it. As far as what the situation would be if it were a common law case, yes, I would take it because the procedures are much simpler and you'd get a jury trial. And if through discovery the facts determine that this was outrageous, you know, for example, if we get into why you're sending this notice out that doesn't have any identifying information, why didn't you notify them about conversion rights? You knew very well that she would convert this policy if she had a chance to do so because she's dying of cancer. So was that a deliberate decision? Under that situation, we could get punitive damages and make it worthwhile. But there's been a law review article, I don't know whether it's quoted in my thing, but it's relevant to your dire decision. It talks about an insurance company that just repeatedly, time and again, I think it was in the 3rd Circuit, the 3rd Circuit tells them that this particular illness is covered by ERISA, you've got to pay it, and they keep on filing because they know all they've got to do is try to settle for some small amount of money. Or even if they settle for the policy themselves, they haven't lost anything. So it's very important that we would be far better off in a common law. And, of course, these Kelly and Brown cases, then I can't see how there could be any question but what they apply. She's claiming that common law rules are preempted by ERISA. Thank you, Your Honor. I believe that's all I have. All right. Thank you very much. The Court will be in recess until 9 o'clock tomorrow morning.